E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture & Recovery Section
TARA B. VAVERE (Cal. Bar No. 279470)
Assistant United States Attorney
Asset Forfeiture & Recovery Section
    United States Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-5901
    Facsimile:  (213) 894-0142
    E-mail:  Tara.Vavere@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:21-cv-02732 |
|---|---|
| Plaintiff, | **VERIFIED COMPLAINT FOR FORFEITURE** |
| v. | |
| | 18 U.S.C. § 981(a)(1)(A) and (C) |
| $4,747,500.00 IN FUNDS, | [USPIS] |
| Defendant. | |

    Plaintiff United States of America brings this claim against defendant $4,747,500.00 in Funds, and alleges as follows:

**JURISDICTION AND VENUE**

    1.    The government brings this <u>in</u> <u>rem</u> forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

    2.    This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. §§ 1355 and 1395.

## **PERSONS AND ENTITIES**

4. The plaintiff in this action is the United States of America.

5. The defendant is $4,747,500.00 in Funds (the "defendant funds") currently held in a receivership controlled by Thomas W. McNamara, of the law firm McNamara Smith, LLP (the "Receiver"). The Receiver was appointed and confirmed in <u>United States of America v. Internet Transaction Services, Inc., et al.</u>, Case No. 2:21-cv-06582-JFW-KSx (the "Intertrans Injunction Case"), in which the Court entered a preliminary injunction and asset freeze on September 2, 2021. The defendant funds consist of the following funds paid to the Receiver pursuant to four separate settlement agreements approved by the Court in the Intertrans Injunction Case:

    a. $4,200,000.00 paid to the Receiver by Linden J. Fellerman ("Fellerman"), who operated Secure Payment Systems, Inc. ("SPS") (<u>See</u> Intertrans Injunction Case at Dkt. Nos. 126 and 129);

    b. $125,000.00 paid to the Receiver by Theodore Sapperstein ("Sapperstein"), Hayes Consulting, LLC ("Hayes Consulting"), and Hayes Markets, LLC ("Hayes Markets") (<u>Id.</u> at Dkt. Nos. 141 and 143);

    c. $107,500.00 paid to the Receiver by Henry LoConti ("LoConti") and GlobalPay, LLC. ("GlobalPay") (<u>Id.</u> at Dkt. Nos. 142 and 144); and

    d. $315,000.00 paid to the Receiver by LendingClub Bank, N.A. ("LendingClub") (<u>Id.</u> at Dkt. Nos. 146 and 152).

6. The persons and entities whose interests may be affected by this action are the Receiver, Fellerman, SPS, Sapperstein, Hayes Consulting, Hayes Markets, LLC, LoConti, GlobalPay, and LendingClub.

///

## BASIS FOR FORFEITURE

Background Of This Matter

7. In 2019, the United States Postal Inspection Service began an investigation into a multi-year bank and wire fraud scheme that targeted the bank accounts of individual victims throughout the United States. The scheme operated by charging unauthorized debits against the victim bank accounts in the name of sham companies created for use in the scheme (the "Shell Entities"). The Shell Entities purported to provide technology-related services, such as cloud storage, and the scheme falsely claimed that the debits against victim accounts were subscriptions to such products and services.

8. Edward Courdy ("Courdy") was a Los Angeles-based broker in the fraud scheme. Along with others, Courdy operated Internet Transaction Services, Inc. and Intertrans.com (collectively, "Intertrans") in furtherance of the scheme. Courdy advised and helped broker domestic payment processing relationships and provided other assistance to the fraud scheme's "merchants," including Guy Benoit ("Benoit").

9. Victims of the fraud scheme were identified through "lead lists" that contained stolen consumer identities and bank account information. Both the consumer-victims' bank accounts and the Shell Entities' bank accounts were generally held at federally insured banks.

10. To fraudulently debit victims' bank accounts, the fraud perpetrators used either the Automated Clearing House network ("ACH") or remotely created electronic checks ("RCCs"), both of which are often transacted through the services of a third-party payment processor.

11. The ACH network is administered by the National Automated Clearing House Association ("NACHA"), which has established rules and guidelines for electronic fund transfers between the network's participants. Using the ACH network, a customer of an originating bank (the "originator") can request to debit funds from an account at a receiving bank and to deposit that amount into the originator's account.

This process is referred to as a "debit entry." Here, the scheme participants who operated the Shell Entities submitted, and caused to be submitted through third-party payment processors to the Shell Entities' originating banks, requests to debit consumer-victim bank accounts. NACHA rules and guidelines permit only authorized ACH transactions, including debit entries. However, through their scheme, the operators of the Shell Entities falsely claimed to have obtained a victim's authorization when making debit entries against that victim's bank account.

12. An RCC claims to be authorized by a third-party using the account holder's name, address, and bank account information. When an RCC was deposited into a Shell Entity's bank account, it would be drawn against the victim's bank account.

13. To obtain payment processing services for both ACH and RCC transactions, thereby facilitating their fraud, Courdy, Benoit, and others created approximately 25 Shell Entities and recruited "signers" to act as the nominal owners of those Shell Entities. The fraudsters also created websites for certain Shell Entities and operated a fraudulent "customer service" call center. The Shell Entities falsely represented that the unauthorized ACH debit entries and RCC withdrawals were authorized subscription fees for technology-related services for which the victims signed up online, such as cloud storage.

14. The fraudsters purposely designed Shell Entity websites to appear legitimate so as to deceive banks and third parties. Benoit and others established email accounts associated with various Shell Entities and used those email accounts to conduct correspondence on behalf of the Shell Entities, switching between aliases in order to provide the appearance that the Shell Entities were unrelated legitimate businesses.

15. Once the fraudsters obtained a consumer's banking information from a lead list, they would often issue a small "micro credit" to the victim's bank account. These micro credits allowed the fraudsters to determine whether the information from a lead list was accurate, such as whether the account number was correct, or the account was open. Once a victim's bank account information was confirmed to be accurate, the

fraudsters would, primarily through third-party payment processors, submit an unauthorized debit entry, oftentimes on a recurring basis, in the name of a Shell Entity against that victim's bank account.

16. Many victims identified the fraudulent debits from their bank accounts and disputed them. The "customer service" call center was based in Ukraine, where Benoit and others employed numerous customer service representatives to field telephone complaints and issue refunds in order to dissuade consumer-victims and/or their banks from rejecting the debit entries as unauthorized or otherwise reporting them to government agencies or the Better Business Bureau. When questioned by a victim, bank, third-party payment processor, or investigator, the fraudsters would falsely claim that the victim had signed up for the Shell Entity's services, which they oftentimes supported with a fabricated Proof of Authorization form.

17. The debit entries against victim bank accounts by Shell Entities resulted in rejected transactions that generated high "return" rates on the processing accounts that originated the debit entries. Debits were sometimes returned as unauthorized after being reported by victim account holders to their banks. Debits were also sometimes returned for administrative reasons, such as an incorrect account number in the lead lists from which victim banking information was taken.

18. High return rates on debit entries are widely recognized by banking institutions to indicate illegal, fraudulent, or unauthorized transactions. For this reason, NACHA imposes return rate thresholds on unauthorized, administrative, and total returns, and accounts that exceed any of these thresholds are subject to increased scrutiny and monitoring, potentially resulting in account suspension or termination.

19. The high return rates of the Shell Entities' unauthorized debits posed a threat to the fraud scheme because of the increased risk that a Shell Entity's processing accounts or relationships would be suspended or terminated. To avoid such suspension or termination, Benoit, Courdy and others manipulated the return rates, thereby circumventing return rate monitoring, by conducting numerous sham "micro debits,"

which artificially depressed the return rates associated with the Shell Entities. These micro debits were low-dollar debits, generally less than $2 each, that one Shell Entity would debit against the bank account of another Shell Entity. Because the Shell Entities were all under the fraudsters' control, there was no risk of a micro debit being returned. These "friendly" micro debits between the Shell Entities therefore increased the number of unreturned debits originated by any given Shell Entity, reducing the return rate associated with that Shell Entity. This artificial suppression of return rates sought to prevent the suspension or termination of banking services used by the Shell Entities, allowing Benoit, Courdy, and others to continue perpetuating the fraud scheme.

20. In consumer complaints compiled by the Federal Trade Commission, numerous victims reported being defrauded by Shell Entities through this scheme. Furthermore, banks that originate unauthorized debits can risk losing the amount of the unauthorized funds in the absence of adequate reserves—for instance, if the unauthorized debits were returned after funds were withdrawn by the originators. Moreover, under NACHA rules and guidelines, a bank for an originator that exceeds return rate thresholds can be subject to review, fines, and special fees. Additionally, the fraud scheme deprived the consumer-victims' banks of property rights they had in the money that was stolen from their customers' accounts.

The Intertrans Injunction Case

21. On August 13, 2021, the United States filed the Intertrans Injunction Case requesting a temporary restraining order, preliminary and permanent injunctions, and other equitable relief pursuant to 18 U.S.C. § 1345. Thirty defendants were named, including 12 individuals and 18 corporate entities (including several Shell Entities). The United States obtained final judgments and permanent injunctions against 28 of the 30 defendants, and voluntarily dismissed the two remaining defendants.

22. As a part of the Intertrans Injunction Case, the Receiver investigated the involvement of Intertrans and numerous Shell Entities that were placed under his receivership. The Receiver confirmed the above-described fraud scheme, finding that,

through SPS alone, the fraudsters conducted over 700,000 unauthorized debit entries against consumer-victim bank accounts, with gross receipts exceeding $30 million, and over eight million micro debits to artificially reduce their processing accounts' return rates and evade bank scrutiny.  See Intertrans Injunction Case at Dkt. No. 80-1, Receiver's First Interim Status Report at p. 3.

23. The Receiver investigated the named defendants' relationships with certain third parties who received payments from the Shell Entities, which represented proceeds of the fraud scheme, and financial institutions that held accounts for or on behalf of Shell Entities.  These third parties included Fellerman, SPS, Sapperstein, Hayes Consulting, Hayes Marketing, LoConti, Global Pay, and LendingClub, among others.  This investigation resulted in the Court's approval of four separate settlement agreements in the Intertrans Injunction Case.  These settlements, as well as background information on these third parties' involvement in the fraud scheme which was not included or admitted to in the settlement agreements, are described as follows.

24. Fellerman operated SPS, which provided third-party payment processing services to Shell Entities in connection with the fraudulent transactions.  Fellerman assisted Courdy and Benoit with legitimizing Shell Entities, and in generating the friendly micro debits between and among Shell Entities, by tracking return rates and calculating how many micro debits were needed to keep a processing account's return rates below the thresholds that would trigger scrutiny and, possibly, account suspension or termination.  Based on the Receiver's investigation of the fees paid to SPS for its processing for Shell Entities, Fellerman agreed to a settlement in the Intertrans Injunction Case whereby Fellerman paid $4,200,000.00 to the Receiver (i.e., a portion of the defendant funds).  The settlement did not include an admission of knowing participation in the fraud scheme by Fellerman or SPS.

25. Sapperstein operated Hayes Consulting and Hayes Marketing, and acted as an agent for third-party payment processors, including SPS.  Sapperstein assisted the scheme by helping secure payment processing and bank accounts for Shell Entities, and

by coordinating the scheme's use of micro debits to artificially reduce return rates. Hayes Consulting and Hayes Marketing received upwards of approximately $300,000.00 in commissions and fees for services provided in connection with SPS and Shell Entities. Based on the Receiver's investigation of the services provided by Sapperstein and his businesses in connection with SPS and Shell Entities, Sapperstein, Hayes Consulting, and Hayes Marketing agreed to a settlement in the Intertrans Injunction Case whereby they were to pay $225,000.00 to the Receiver in installments. The settlement did not include an admission of knowing participation in the fraud scheme by Sapperstein, Hayes Consulting, or Hayes Marketing. After making the first installment payment of $125,000.00 to the Receiver (i.e., the second portion of the defendant funds), Sapperstein, Hayes Consulting and Hayes Marketing defaulted on the terms of their settlement agreement with the Receiver and a confession of judgment was entered in the Intertrans Injunction Case as contemplated in the settlement agreement. See Dkt. No. 153.

26. LoConti is the president of GlobalPay, which acted as an agent for various third-party payment processors, including SPS. LoConti assisted the scheme by helping secure payment processing and bank accounts for Shell Entities, coordinating the scheme's use of micro debits to artificially reduce return rates, and issuing micro credits to verify lead list information. GlobalPay received approximately $200,000.00 in commissions and fees for services provided in connection with SPS and Shell Entities. Based on the Receiver's investigation of GlobalPay's services provided to SPS and the Shell Entities, LoConti and GlobalPay agreed to a settlement in the Intertrans Injunction Case whereby LoConti and GlobalPay paid $107,500.00 to the Receiver (i.e., the third portion of the defendant funds). The settlement did not include an admission of knowing participation in the fraud scheme by LoConti or GlobalPay.

27. Throughout the fraud scheme, two of the Shell Entities (Dollar Web Sales and VPN Me Now) maintained bank accounts at LendingClub. The Receiver became aware of transactions made from the Shell Entities' accounts at LendingClub that

occurred after LendingClub was served the asset freeze order in the Intertrans Injunction Case. Based on the Receiver's investigation into these post-receivership transactions, LendingClub agreed to a settlement in the Intertrans Injunction Case whereby LendingClub paid $315,000.00 to the Receiver (<u>i.e.</u>, the final portion of the defendant funds). The settlement did not include an admission of knowing participation in the fraud scheme by LendingClub.

## FIRST CLAIM FOR RELIEF

28. Plaintiff incorporates the allegations in paragraphs 1-27 as though fully set forth herein.

29. Based on the above, plaintiff alleges that the defendant funds constitute or are derived from proceeds traceable to one or more violations of 18 U.S.C. §§ 1343 (wire fraud) and/or 1344 (bank fraud), which are specified unlawful activities as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). The defendant funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

30. Plaintiff incorporates the allegations in paragraphs 1-27 as though fully set forth herein.

31. Based on the above, plaintiff alleges that the defendant funds constitute property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i) or (a)(1)(B)(i), with the specified unlawful activity being violations of 18 U.S.C. §§ 1343 (wire fraud) and/or 1344 (bank fraud). The defendant funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the defendant funds;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the defendant funds to the United States of America for disposition according to law; and

1      (d)   for such other and further relief as this Court may deem just and proper,
2  together with the costs and disbursements of this action.

3  Dated: April 12, 2023

        E. MARTIN ESTRADA
        United States Attorney
        MACK E. JENKINS
        Assistant United States Attorney
        Chief, Criminal Division
        JONATHAN GALATZAN
        Assistant United States Attorney
        Chief, Asset Forfeiture & Recovery Section

        /s/*Tara B. Vavere*
        TARA B. VAVERE
        Assistant United States Attorney
        Asset Forfeiture & Recovery Section

        Attorneys for Plaintiff
        UNITED STATES OF AMERICA

**VERIFICATION**

I, Stephanie Glad, hereby declare that:

1. I am a Postal Inspector with the United States Postal Inspection Service and the case agent for the forfeiture matter entitled <u>United States of America v. $4,747,500.00 in Funds</u>.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed April 6, 2023 in Washington, DC.

_____
STEPHANIE GLAD

11